DIMITRY *et al. v.* JONES *et al.**

(Division B.   March 5, 1928. Suggestion of Error Overruled May 7, 1928.)

[115 So. 786.   No. 26665.]

1. CONSTITUTIONAL LAW.   *Taxation.   State may adopt any method of assessing land for taxes so that reasonable notice and due process of law are afforded; statute providing for assessing land by government surveys or plan as shown in maps and other descriptions sufficiently complies with due process; government survey of Spanish land grant in regular townships, sections, and ranges, noting them on map, authorizes state's use of such designations in assessment (Hemingway's Code 1917, section 6917).*

The state in assessing property for taxation can adopt any method for making its land assessment that complies with the requirement of reasonable notice and due process of law.   Section 6917, Hemingway's Code 1917, providing that land shall be assessed according to government surveys where such exist, and lands not surveyed according to township, range, and section, shall be assessed according to the plan of the government as shown in the government maps and other descriptions by which the land may be distinguished, sufficiently complies with due process.   A government survey of a Spanish land grant laying the same off into regular townships, sections, and ranges, noting them on the map, authorizes the state to use such designations in assessing lands.

149 Miss.—41.

2. ADVERSE POSSESSION. *Taxation. Tax title based on assessment by government survey, otherwise valid, held to prevail over Spanish land grant claim; land held in private ownership is subject to state statutes on assessment; land held in private ownership is subject to state statutes on adverse possession (Hemingway's Code 1917, section 6917.)*

In a contest between the owner of Spanish land grant and the purchaser at a tax sale where the lands were assessed as indicated and as in the preceding syllabus, the tax title, if otherwise valid, will prevail over the Spanish land grant claim. Property held in private ownership is subject to the state statutes on assessment and on adverse possession.

---

*Corpus Juris-Cyc, References: Taxation, 37Cyc, p. 769, n. 18; p. 988, n. 91; p. 1054, n. 23; p. 1493, n. 10.

APPEAL from chancery court of Harrison county.

HON. V. A. GRIFFITH, Chancellor.

Suit by Theodore J. Dimitry and others against J. L. Jones and others. From a decree of dismissal, complainants appeal. Affirmed.

*J. F. Galloway,* for appellants.

Complainants seek by the proceedings here to have quieted and confirmed their title to a tract of land which is a part of the private grant or confirmation of Alexander Dimitry, more particularly described in the bill of complaint. Defendants did not deny in their answer, that the complainants had been divested of their title, except by virtue of a tax deed executed by William Reeves, sheriff and tax collector of Harrison county, Mississippi, in July, 1911, for the delinquent taxes of the year 1910. There was a proceeding by the defendant, J. L. Jones, to have said title by tax sale quieted and confirmed in the chancery court of Harrison county.

It is the contention of complainants that the description by section numbers did not apply to any land within said grant; and that the legal notices involved in said

tax sale and proceedings in confirmation were not no-
tice to the Dimitrys of any hostile assertions of title.
That the official plat of said township in force and effect,
at the date of said tax sale, showed that section 33 was
fractional, that the northwest quarter was fractional,
containing sixty and six hundredths acres, and that the
northeast quarter was fractional, containing three and
thirty hundredths acres; that the said land was patented
by the state of Mississippi as containing sixty-three and
thirty-six hundredths acres, and all of said fractional
section; that the tract book of original entries and all of
the proceedings by the United States surveyor general's
office showed that said section 33 was fractional, as afore-
said, and was never intended to apply to or include any
land within said private claim.

On the other hand it is the contention of the defend-
ants that the description contained in said tax deeds and
proceedings in confirmation in the chancery court were
legally sufficient to identify the land, and did sufficiently
identify the same, to be translative of a good and suffi-
cient title to the purchaser at said sale, and to divest all
claims of complainants.

Complainants contend that this case comes within the
rule announced so often by this court in the following
cases: *Surget* v. *Little,* 24 Miss. 118; *Trager* v. *Jenkins,*
75 Miss. 676; *Dedeaux* v. *Bayou Delisle Lumber Com-
pany,* 112 Miss. 325, 73 So. 53; *Goff* v. *Avent,* 122 Miss.
86, 84 So. 134, also 129 Miss. 782, 93 So. 193; *Galloway* v.
*Inglis,* 103 So. 147; *Lott* v. *Rouse,* 144 Miss. 802, 111 So.
838; *Weston Lumber Company* v. *Strahan,* 128 Miss. 54,
90 So. 452, to the effect that regular sectional numbers
did not describe or include any land within private claims.

Defendant attempts to distinguish the present case on
the facts from those above referred to, upon the point
that there appear certain dotted lines within the area
of the private claim, which they contend mean regular
sections.

Facts from the record:

The Dimitry claim, which was confirmed by the Act of Congress of March 2, 1837, was based upon a favorable report therefor of the register and receiver of the United States Land Office at St. Stephens, acting as commissioners under an applicable federal statute, dated February 16, 1834. This confirmation by congress was without directions for issuance of formal patent. The said commissioner's report shows that said claim was composed of three ancient Spanish grants, briefly described as follows:

1. A grant to Micheal Dragon, consisting of five thousand and forty arpents by Governor Morales, dated May 29, 1802, situated upon the Bay of St. Louis, in the possession of the said Dragon from 1798 to 1821, the date of his death, according to a survey of land and official plat thereof made and approved by Don Carlos Trudeau, surveyor general and particular of the Provinces of Louisiana and West Florida, dated April 15, 1602, recorded in Book C., No. 2, folio 62, page 1524 of the records of plats in the surveyor general's office. The certificate of survey recited:

"Charles Trudeau, royal and particular surveyor of the Province of Louisiana, etc., I do hereby certify that I have bounded and put limits in favor and in the presence of Micheal Dragon, and with the assistance of the Senor Philip Saucier and the adjoining neighbors, a tract of land of one hundred twenty-six arpent front to the Bayou Lobos, with the ordinary depth of forty arpents."

The formal grant or patent of said land in favor of Dragon was signed by John Ventura Morales, Accomptant General of the Army, Intendant *pro tem* of the royal finances of these Provinces of Louisiana and West Florida, superintendent, subdelegate, Judge of the Vessels that put in, lands and tools belonging to the King, and was recorded in "The Book of Concessions" or grants in the archives and notarial records of said provinces,

"from folio 41 to folio 43 of the book that serves for this purpose."

2. A Spanish grant in favor of Fancisco Saucier, dated November 17, 1789, to a tract of land adjoining the Micheal Dragon tract, consisting of seven hundred arpents, in the possession of the said Saucier and Micheal Dragon from 1798 to 1821. Recorded in the land records of the Province of Louisiana and West Florida in Book 8, page 18: this tract of land was also duly surveyed, mapped and certified by the surveyor general's office, and the plat thereof approved and filed in the records and plats of said officer.

3. A Spanish grant in favor of Philip Saucier, dated December 20, 1797, adjoining the other two tracts just above described, consisting of two hundred twenty-eight arpents, in the possession of the Saucier and Micheal Dragon from 1798 to 1821. This grant was also duly surveyed.

In conformity with the federal law, which required the claimants to land within the Provinces of Louisiana and West Florida, to present their evidence of title to commissioners for examination and report for confirmation, Micheal Dragon caused certified copies of these grants, maps and proceedings to be made, and during the month of June, 1820, sent them by Demetry Canna of Bay St. Louis, his agent, who presented them, translated in English, to W. Barton, commissioner, at Jackson, Mississippi. These certified translations were refused by Barton, because he said the originals would be better evidence. But, that during the month of September, "The said Demetry Canna presented to me at Bay St. Louis the three original grants, of which copies in English are hereto annexed, marked A, B, and C." The said Barton further found them to be formal grants, all executed anterior to the session, and were complete grants without condition. These grants and maps seem to have been forwarded by the register and receiver of the General

Land Office of Jackson, Mississippi, to the commissioner of the General Land Office, who in turn transmitted them to Congress.

The treaty of the Cession of Louisiana, including West Florida, was ratified on October 21, 1803, and provided by Article 11, "All public lots and squares, vacant lands and all public buildings, fortifications, barracks and other edifices which are not private property," should be ceded.

And further: "The archives, papers and documents relative to the domain and sovereignty of Louisiana and its dependencies will be left in the possession of the commissaries of the United States, and copies will be afterwards given in due form to the magistrates and municipal officers of such of the said papers and documents as may be necessary to them."

Article 111 of said treaty provides that the inhabitants of the ceded territory shall have all, "the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property and the religion which they profess."

In the meantime Micheal Dragon departed this life, but left surviving him as his sole and only heir, his daughter, Marie Ann Dragon, who married Andrea Dimitry, and nothing having been accomplished toward securing a confirmation of the claims of said Dragon, it appears renewed efforts were made to said end. A number of affidavits were filed, made by citizens, neighbors and officers who knew personally the said Micheal Dragon, his daughter, Marie Ann, her husband, Andrea Dimitry, and were also familiar with the property in question, its location, boundaries as actually run and marked, and its area.

The entire file of papers leading up to the confirmation of this claim, which were filed before the register and receiver as commissioners, as aforesaid, by certified copy, have been introduced into this record and appear at

pages 284 and 344. On the records of the General Land Office this file is referred to as ''Mississippi Private Land' Claim, Docket No. 135'' and contains pages 1 to 94, inclusive. This file was certified to by the General Land Office on April 2, 1838.

The file of papers above referred to contained a map which is an exact copy of the map of the grant to Micheal Dragon, the original of which has been introduced in evidence here.

In 1821 and 1822 a deputy surveyor for the United States Government surveyed the territory embraced by townships 7 and 8, range 12 west, into regular sections, and plats were made of this survey and approved by the surveyor general's office. These plats show no Spanish grants within said township and range. The survey and plat seem to have been made contrary to the instructions of the General Land Office, and were later repudiated because they had contained nothing showing the private claims therein. The claims of Dimitry and Bartholomew Pellerin, ancient Spanish grants afterwards confirmed, take up approximately eighty per cent, of said township 8 and range 12.

The Act of Congress, 1803, 2 U. S. Laws 534, made provision for the survey and selling of land in the Mississippi territory under the same rules which had been prescribed for the Northwest Territory. This act directed that all private claims to land should be first surveyed and set apart. H. & H. Dig. 74 d. This requirement of the federal law was carried forward in numerous instructions from the commissioner of the General Land Office, addressed to the surveyor general and his deputies, and also by prepared instructions in pamphlet form circulated broadly among them. Many of these instructions will be found in the American State Papers concerning public lands.

In this connection on August 20, 1885, the commissioner wrote a letter to Robert Butler, surveyor general, as follows:

"By surveying and sectioning large quantities of land in Louisiana and Mississippi before the private claims were finally acted upon and including much barren piney land, the government and individuals have been put to great inconvenience and much money has been unnecessarily expended. Your instructions were given with a view to prevent the recurrence of the same errors. The object of the government is, for the present, to bring into market the lands in Florida which are entirely exempt from private claims, and which may be most in demand for the accommodation of actual settlers. You will, therefore, take care to have no township sectioned in which there are private claims." American State Papers, Vol. 5, page 465—Duff Greene Edition.

On Monday, December 5, 1836, an act was passed by congress "confirming the claim of the heirs of Micheal Dragon to certain tracts of land therein mentioned." This act confirmed "the report of the register and receiver of the land office for the district of St. Stephens, in the state of Alabama,—the claims of Andrea Dimitry, of the heirs of Micheal Dragon, deceased, to three several tracts of land, situated on the Bay of St. Louis in the state of Louisiana, the title to which was derived from the Spanish government of that county, etc." The said act was approved by President Andrew Jackson, on March 2, 1837.

The file of letters written by the Dimitrys to the commissioners of the General Land Office waging a prolonged fight against illegal survey of this grant, by deputy surveyors, appears in this record. And this was continued until 1849 when the survey by Augustus S. Phelps was completed, and his map filed with and approved by C. A. Bradford, surveyor general. The Phelps' map appeared in this record, designated as Exhibit "C."

The Act of Congress approved August 5, 1848, provides, "that all confirmed claims situated in the state of

Mississippi, which had not been actually surveyed on the ground, and for which no plats of actual survey had been returned to the surveyor general's office, south of Tennessee, on or before the 1st day of January, 1839, shall be and are hereby confirmed according to actual surveys hereafter to be made." And further "the surveyor general is hereby authorized and directed, on the request of any party interested, to cause the survey of said claims, without delay, and at any time between the passage of this act, and the last day of January, 1850, to be made and returned to this office; and he shall certify the return and plats of such actual survey, so made to his office, to the register and receiver for lands in the Augusta district for said state. And, the surveyor general and the said register and receiver shall regard these claims and plats of actual survey, in all respects, upon the same footing with the claims confirmed as actually surveyed upon the ground by said act, to which this is a supplement."

The survey by Phelps of the Dimitry claim, its subsequent approval by the surveyor general's office and delineation upon the supplemental township plat, approved October 30, 1849, by the surveyor general's office, comes under the provision of the above statute as well as others applicable. The General Land Office also recognized this plat as the true one.

Before the treaty for the Cession of the Provinces of Louisiana and West Florida was negotiated and before the treaty between Spain and France, whereby these Provinces passed under the control of France, the three tracts of land comprising what is now known as the Dimitry claim were settled upon by citizens of Spain. They practiced the "diligencies" and made the "showing of ability" to meet the requirements of the Spanish Law, as to issuance of formal grants; they also procured the land to be surveyed and platted by the surveyor general of said government, had said map approved and filed in

the records of official plats of said Provinces, and presented the originals to the Spanish officer charged by the King with disposal of the public land. Whereupon, letters patent or grants were executed in due form in favor of the claimants by said government, which were duly recorded in the books kept for that purpose in the land office of said Provinces. These ancient records were delivered by the Spanish government to the commissioners of the General Land Office of the United States. They were destroyed by fire in 1865, according to the record in the case of *Smyth* v. *Canal Bank,* 93 Fed. 913. However, the original grants and maps were filed with the commissioners of the United States general land office for examination and report by Micheal Dragon, the then owner and claimant. Certified copies of these ancient grants obtained from the files of said office are in this record. The Dragon grant, in which the property in question is situated, was well known in the land office at Washington, D. C., and by some means, also to the United States Supreme Court, because in the famous case of *Menard Heirs* v. *Massey,* 29 U. S. 1, 8 How. 292, there appears by order of the court an exact translation of this grant, together with Trudeau's Certificate of Survey. This ancient grant was again referred to by the United States Supreme Court in the case of *United States* v. *Mayor, Aldermen and Inhabitants of the Cities of Philadelphia and New Orleans,* a famous case involving the lands of McDonough under his famous will. See Howard 11, 13 L. Ed. 835.

The highest authority in this land has recognized this old claim as a complete Spanish grant, and a model thereof to be followed. The commissioners of the General Land Office, Whitcomb, Moore and Shields, also recognized it as such, as well as the surveyor generals Howard, Ludlow and Bradford, all as appears from their letters and instructions issued to subordinate officers.

And Congress, by the Act of March 2, 1837, with the said grants, maps and plat of the Spanish surveyors be-

fore it, ratified and confirmed the same. The laws of Nations would have been violated, if there had been any deviation, and private property might have been confiscated and private rights annulled. Chief Justice MARSHALL announced this principle in *United States* v. *Percheman,* 7 Peters 51, 8 L. Ed. 604.

The learned chief justice was construing the treaty between the United States and Spain, whereby the United States acquired East Florida, and the Government of Spain surrendered its pretentions of sovereignty to the province of West Florida, in 1819, ratified in 1821. The treaty for the Cession of Louisiana ratified in 1803 provides by article 111, "that the inhabitants of the Territory should be admitted into the Union, according to the principles of the federal constitution, to the enjoyment of all the rights of citizens of the United States, and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion which they profess." And article 11, of said treaty provided for the "Cession of all public lots and squares, vacant lands and all public buildings, fortifications, barracks, and other edifices which are not private property."

In *Soulard* v. *United States,* 4 Peters, 7 Law Ed. 838, Chief Justice MARSHALL construed the treaty by which Louisiana was acquired. These principles were again re-announced by the United States Supreme Court in the case of *Strother* v. *Lucase,* 12 Peters, 9 L. Ed. 1148. See, also, *Nevitt* v. *Beaumont,* 6 Howard (Miss. Reports), 250. The Act of 1796 created the surveyor general's office of the United States, first authorized the survey of the public lands by such an office. The Act of 1803 extended the provisions of the Act of 1796 to the Mississippi Territory. At that time the Mississippi Territory did not extend South of the 31st degree of North Latitude or include the Territory then known as West Florida. The survey of these grants were therefore made by the only

authority empowered to survey public lands for the pur-
poses of sale, etc.   With the exercise of that authority,
delivery of possession, execution and delivery of the for-
mal grants therefor, recordation of the same, all juris-
diction or authority of the political department of the
government, passed out of existence.   When the United
States government acquired it, the private right had
been fully fixed, and it had no more jurisdiction than had
the Spanish government to enter upon said land and
make new or corrective surveys thereof.   Any surveys
within the boundaries of said claim, under public au-
thority, were illegal trespasses upon the rights of the
owners.

A confirmation by Congress of a private claim embraces
other questions besides validity, such as extent, quantity,
location, boundary, etc.   This doctrine is very clearly set
out in *Moore* v. *Steinbach,* 31 Law Ed. 55.

The court will note when Congress acted on the Dimi-
try matter, that the grants, maps and plats, deeds, affi-
davits and all  the old records in connection with the
claim was before it, exactly as in the case above cited.
The act, therefore, confirmed the land in the heirs of
Micheal Dragon, as set out by said papers without the
necessity of a survey or the issuance of a patent.   *United
States* v. *Maria de la Paz Valdez De Conway,* 175 U. S.
72, 44 L. Ed. 61, citing *Beard* v. *Federy,* 3 Wall. 478, 18
L. Ed. 88; *Henshaw* v. *Bissell,* 18 Wall, 268, 21 L. Ed.
840; *Miller* v. *Dale,* 92 U. S. 478, 23 L. Ed. 738.

The Act of Congress, 1803, provided that the private
claims should be first surveyed.   The instructions issued
by the commissioners of the General Land Office were
often and urgent, that only those townships, which were
known to be free of private claims, should be cut up into
sections.   If the said surveys had been duly authorized
by the land office, they would have been illegal under the
rule announced by the United States Supreme Court in
*Lane, Secretary of Interior,* v. *Darlington,* 249 U. S.
—, 63 L. Ed. 629.

The mischief of. promiscuous and ill-advised resurveys of corrective surveys, even of public lands, is ably and forcibly set out in the famous case of *Cragin* v. *Powell,* 128 U. S. —, 32 L. Ed. 691. The commissioner of the General Land Office recognized this also, and in all of their letters and instructions about it cautioned the surveying officers to retrace the original lines, and not to interfere with the boundaries as fixed by the Spanish Surveyor General, Trudeau. These instructions required that the ancient lines be retraced, and ''that you will return at as early date as possible a separate plat of said claim, also a diagram showing its connection with the contiguous public surveys.''

The department was strictly following the principles announced in *Cragin* v. *Powell, supra,* and also, that the deputy surveyors were instructed only to run the exterior boundaries and to note as they passed ''connections with the township and section lines at each intersection,'' in order to ascertain ''the contact and distance of the lines of sections made fractional thereby.'' This was in order to properly designate the fractional sections and to compute their areas. The first line above the certificate of survey says: ''The lines marked thus —X— were resurveyed by Mr. Phelps.'' Observing the maps, the exterior boundaries of said claim beginning at the center of section 28, proceeding southeast to the southeast corner, thence in a southwesterly direction along the south boundary are marked —X—. A careful reading of the process verbal of the survey just beneath the map shows that no sectional lines were run, except to mark the intersections of the grant lines with the boundaries of the sections made fractional thereby.

The instructions of the commissioners with regard to taking the connections with the sectional lines was evidently to conform to United States Revised Statutes, section 2396: The Phelps' survey was finally approved and the supplemental plats of October 30, 1849, entered

upon the township plats where the claim was situated, by order of the commissioner and with the approval of the surveyor general. It thereby became the official plat of the sections and grants in that part of said townships. The ruling in the *Galloway-Inglis case, supra,* applies with equal force to any territory covered by the Dimitry claim. The township plats of 1832 and 1847 were thereby vacated and annulled and the sectional surveys upon which they were based vanished from legal existence. For the courts to hold otherwise is "to take from the officers of the land department the functions which the law confides to them, and exercise them by this court." See *Litchfield* v. *Register (Littlefield* v. *Richards),* 9 Wall, 575, 578, 19 L. Ed. 681, 682; *Minnesota* v. *Land,* 247 U. S. 243, 250, 62 L. Ed. 1098, 1101; *U. S.* v. *State Investment Co.,* 68 L. Ed. 639 (1924).

Had Congress passed a special act authorizing the surveys within said territory of the Dimitry grant, it would have met with the prohibition of the Constitution of the United States, upon the impairing of the obligations of contracts. See *Wolf* v. *N. O.,* 103 U. S. 358, 367, 26 L. Ed. 395, 399; *Providence Bank* v. *Billings,* 4 Pet. 514, 560, 7 L. Ed. 939, 955; *New Jersey* v. *Wilson,* 7 Cranch, 164, 166, 3 L. Ed. 303; *New Orleans Gas-Light Co.* v. *La. L. & N. Co.,* 6 S. Ct. 252, 115 U. S. 650, 663, 664, 29 L. Ed. 516, 521.

But counsel for defendants has insisted with great force and persuasive eloquence, so much that the Honorable Chancellor seems to have been influenced thereby, that the presence of the dotted lines within the Dimitry claim represent full section lines, and that section 33 is shown thereby to be a whole, regular section. That an assessment of land within the grant by regular sectional numbers, by reason thereof, is a valid description, identifies the land, and is notice to the world, generally, and to the owner in particular of the lien placed thereon following such assessment, for the public revenue. The

meaning of dotted lines on United States plats of public lands had been put to sleep in 1839 by the decision of our Supreme Court in *Newman* v. *Foster's Heirs,* reported in 3 How. 383.

The meaning of dotted lines on the township plat of township 8 south, range 12 west was before this court in the case of *Galloway* v. *Inglis,* 103 So. 147, and this court found the same as Judge TROTTER found eighty-six years ago, that the dotted lines on such plats did not represent boundaries, and, "that the sections were never run and marked on the ground as acquired by law." The controversy in the Galloway-Inglis case involved a sale for a valuable consideration. The controversy here is over a tax sale. A purchaser at such a sale is a purchaser *in invitum,* he take it *cononore* with full knowledge of the applicable laws governing such proceedings, and that in effect the sale was a confiscation.

The confirmation suit referred to in appellee's chain of title, styled *J. L. Jones* v. *Staples et al.* is in no better light than the tax deed is assumed to reform and to remove cloud of title off of. The complainant in said suit described the land to which he claimed title as "the northwest quarter of section 33, township 7, range 12 west." The northwest quarter of this section, lies entirely north and west of Wolf river and according to all of the plat, and the tract book of original entries, contains sixty and six hundredths acres.

We invoke the rule of property which has stood without question in this state for more than seventy-seven years; the doctrine so clearly and ably announced by Chief Justice SHARKEY in *Surget* v. *Little;* and which has been reaffirmed in the cases hereinbefore referred to and never disputed as the Law of this state and of all the other states of the Union.

*Gardner, Brown & Morse,* for appellee.

The land involved in this suit had always been assessed, as far back as could be traced, as a component

part of section 33, according to the government plat. And in 1911 there was assessed to unknown, and sold to appellee for delinquent taxes, the land now involved, described as "all south of Wolf river in section 33, township 7, range 12." In due course a tax deed was delivered to appellee, who thereupon entered into the actual occupation of the land and has so remained in actual occupation up to the present day. In 1920 appellee confirmed his title to the land, making as defendants to his suit, among various other parties specifically named, "Micheal Dragon, Andrea Dimitry, Marie Ann Dimitry, if living, or if dead, against the heirs at law of all said named defendants . . . and also against the Oak Grove Lodge, a corporation," etc. A final decree was rendered in said cause on February 26, 1920, confirming appellees' title.

A portion of section 33 is not within the Dimitry claim, and was granted by the government to the state of Mississippi. Title to this portion became vested in the Ingram-Day Lumber Company.

Appellants made no attempt to show that they or anyone else had paid the taxes for which the land was sold or that they had ever paid any taxes or had ever been in possession. Their sole contention was that the United States had no right to survey the land into regulation sectional divisions, and that a tax sale predicated upon such description is void.

The chancellor upheld the tax sale, and further found as a question of fact, that appellee had been in the actual occupation of the land, under his tax title, for more than three years prior to the institution of this suit.

The crux of appellants' case is their contention that the government was without power to survey the Dimitry claim into the regulation governmental sections, and that the Dimitry claim can only be described and designated as section 37, township 7 south, range 12 west, as set out in the field notes of August S.

Phelps, the original governmental surveyor. The proof shows that the Government Land Office disregarded the designation of the Dimitry claim by the surveyor as section 37, and that all governmental maps of the Dimitry grant show the same to be surveyed into and designated by the usual governmental sectional divisions. The proof shows that there is a section 37 in township 7 south, range 12 west, being the claim of Philip Saucier (also an old Spanish grant); so that section 37, as designated by the government plats, is about two miles west of the land here involved.

Appellee relies upon the following points of law and authorities. Congress provided, by general statute, for the survey not only of public lands but of private claims. 1 Comp. Stat. 348. Government plats are the best evidence and are conclusive of the facts thereon shown, and cannot be attacked collaterally. *Stoneroad* v. *Stoneroad,* 39 L. Ed. 966, at 970; *Russee* v. *Maxwell,* 39 L. Ed. 971; *Knight* v. *U. S. Land Assessment,* 35 L. Ed. 974, at 979; *Whitloke* v. *MacBridge,* 49 L. Ed. 857; *Harris* v. *State,* 40 L. Ed. 68; *Haney* v. *Jordan,* 35 L. Ed. 428; *Kumland* v. *Hunter,* 1 L. R. A. (N. S.) 745 at 749; *Surget* v. *Little,* 5 S. & M. 319, 24 Miss. 118; *Weston Lbr. Co.* v. *Strahan,* 128 Miss. 54, 90 So. 452.

The legislature may and has provided what shall be a sufficient description for assessing lands and how it shall be established. *Read* v. *Heard,* 53 So. 400. The legislature has provided for the assessment of land "by governmental surveys by descriptions used on governmental maps," etc. Section 6917, of Hemingway's Code; *Weston Lbr. Co.* v. *Strahan,* 90 So. 452.

In the event of discrepancy between the field notes and the plat, the plat controls. *Surget* v. *Little,* 5 S. & M. 319, 24 Miss. 118; *Weston Lbr. Co.* v. *Strahan,* 90 So. 452.

Appellants' ancestor accepted and adopted the government survey when made, hence they are now estopped from complaining. *Carondelet* v. *St. Louis,* 17 L. Ed. 102.

149 Miss.—42.

The several statutes of limitations afforded by our
laws relative to the bringing of actions; (a) Section
2455, of Hemingway's Code, providing for the bringing
of actions within ten years next following the right to
make an entry, etc. *Jones* v. *Rogers,* 85 Miss. 805. (b)
Section 2458—Ten years' adverse possession gives title.
(c) Section 2459—Three years' actual occupation under
a tax title bars suit. *Slawson* v. *Adams Mach. Co.,* 78
So. 753. (d) Section 2649—Bills of review limited to
two years.

The cases, from which counsel quote so fully, present
a most imposing and formidable array of authority, as is
shown by the following compilation, taken from their
brief; namely, *U. S.* v. *Percheman,* 8 L. Ed. 604; *Soulard*
v. *U. S.,* 7 L. Ed. 938; *Strother* v. *Lucas,* 9 L. Ed. 1085;
*Menard's Heirs* v. *Massey,* 12 L. Ed. 1085; *Moore* v. *Stein-
bach,* 31 L. Ed. 55; *Beard* v. *Federy,* 18 L. Ed. 88; *Snyder*
v. *Sickles,* 25 L. Ed. 97; *Alviso* v. *U. S.,* 19 L. Ed. 305;
*Higueras* v. *U. S.,* 18 L. Ed. 469; *Tameling* v. *U. S. Fre-
chold Co.,* 23 L. Ed. 1002; *U. S.* v. *Maria de la Paz Valdez,
etc.,* 44 L. Ed. 72; *Lane* v. *Darlington,* 63 L. Ed. 629; *Kean*
v. *Calumet,* 47 L. Ed. 1134; *Cragin* v. *Powell,* 32 L. Ed.
566; *Cox* v. *Hart,* 67 L. Ed. 333; *U. S.* v. *Morrison,* 60
L. Ed. 299; *Littlefield* v. *Richards,* 19 L. Ed. 681; *Minne-
sota* v. *Land,* 62 L. Ed. 1098; *U. S.* v. *State Investment
Co.,* 68 L. Ed. 639; *Moore* v. *Robbins,* 24 L. Ed. 848; *Wolf*
v. *New Orleans,* 26 L. Ed. 395, 399.

But we unhesitatingly assert that the above cases do
not afford authority or serve as precedent in the instant
suit; that the issues involved in them are not akin to the
questions presented here; and that such help, if any, as
may be gained therefrom is more favorable to appellee
than to appellant. *Soulard* v. *United States,* 7 L. Ed.
938, merely held that the claimants were the owners of
so much of the land theretofore granted by the Spanish
sovereign as had not been sold by the United States; and
that as to such land as had been sold by the United States,

the claimants were entitled to an equal quantity of government land.

*U. S.* v. *Percheman,* 8 L. Ed. 604, presents a similar question, i. e., the right of title of the claimant to lands derived from the Spanish government anterior to the cession of the Florida territory, and does not remotely involve the right of our government to make a survey or the method by which such survey may be designated. *Strother* v. *Lucas,* 9 L. Ed. 1137, was an ejectment suit between individuals, both of whom claimed under a, Spanish grant. No right, custom or usage of the United States was involved or considered. *Moore* v. *Robbin,* 24 L. Ed. 848, merely holds that "a patent for any part of the public lands, when issued by the land department, acting within the scope of its authority, carries with it, when delivered and accepted by the grantee, the legal title to the land, and with it passes all control of the executive department of the government over the title." No question of title under conflicting grants or patents is concerned in this suit, hence the above authority has no application. *Litchfield* v. *Richards,* 19 L. Ed. 681, holds that "the judiciary cannot interfere with executive officers in the discharge of their official duties involving judgment or discretion." *Wolf* v. *N. O.,* 26 L. Ed. 395, is a suit touching the right of a municipality to issue bonds. *U. S.* v. *Maria de la Paz Valdez, etc.,* 44 L. Ed. 72, is another case involving conflicting grants. Appellee is not claiming under any conveyance by the government. He is claiming under a tax title wherein the land is described and sold according to the official government plat. *Beard* v. *Federy,* 18 L. Ed. 88, is simply a case involving priority of title under a Mexican land grant and a United States land patent, respectively. *Higuera* v. *United States,* 18 L. Ed. 469, is another case involving a Mexican land grant, and does not raise any question as to the right of the United States to make a survey of such land. The only issue was the correctness, as to

boundaries and area, of lands claimed by Higuera under a Mexican grant. *Alviso* v. *United States,* 19 L. Ed. 305, is a similar case, involving a Mexican land grant. The case does not remotely concern a tax sale or any right of the government to make a survey. *Snyder* v. *Sickles,* 25 L. Ed. 97, presents the following points only.

1. A Spanish grant of land, which has been confirmed by the commissioners, and which is indefinite, uncertain and vague as to its boundaries, attaches to no particular tract, and must be surveyed and located before the party can be entitled to a patent and before a recovery in ejectment for it can be sustained.

2. Where a survey made has been disapproved by the Secretary of the Interior, the grant remains where it stood at the date of confirmation, and the owner of the same cannot claim either a patent or patent certificate under the confirmation act.

3. The act as to issuing patents dispenses with the necessity of issuing patents for such lands in all cases where the party interested is by law entitled to a patent, and in no other cases. The act does not dispense with a survey made necessary by the act under which the confirmation was decreed, in order to entitle the party to a patent.

4. Extrinsic proof of the boundaries of the land in such cases cannot be admitted while the act of Congress requiring the survey remains in full force:

*Menard's Heirs* v. *Massie,* 12 L. Ed. 1085, was one of those cases arising from the conflict between an old Spanish cession and a title otherwise acquired. The case bears no semblance of authority for appellants' contention. *United States* v. *Philadelphia & N. O.,* 13 L. Ed. 835, is another case involving the same question, i. e., a conflict of titles resulting from grants by a Spanish government and subsequently by the United States.

*Cragin* v. *Powell,* 32 L. Ed. 566, is a case involving a matter of boundaries in dispute between private owners.

Appellants' complaint, after a lapse of seventy-six years, is not really directed at the government's right to make the survey, but goes merely to the clerical manner by which the survey is designated on the plat.

Appellants charge that the survey made by August Phelps, United States surveyor, followed the survey made by the Spanish surveyor, Charles Trudeau, "and retraced the lines and boundaries so located by said Spanish surveyor." Our case presents no question of a conveyance by the United States of land previously granted by a foreign sovereign, that distinguishes the case at bar from the case of *Surget* v. *Little,* 24 Miss. 118.

For in the instant case the government plats show the Dimitry claim surveyed into regulation sections; and by such description the land involved was sold for delinquent taxes. There is no government plat designating the Dimitry grant as section 37. The purpose of a survey of foreign grants was to segregate them from the public lands, i. e., lands which our own government had the sovereign right to convey. An instructive exposition of this subject is found in the opinion of Chief Justice SHARKEY in *Surget* v. *Little,* 24 Miss. 120. The purpose of a survey, was so to distinguish and identify the private grants as to render them free from liability to sale by the United States government as public lands. The clerical method of designating such grants on the official plats is wholly within the discretion of the General Land Office, and cannot be collaterally attacked. *Lane* v. *Darlington,* 39 Sup. Ct. Rep. 299. Even if we give countenance to this theory of appellants as an attempt to show that the land was not validly assessed because of an alleged improper description, such contention on their part must fall. *Reed* v. *Heard,* 53 So. 402.

The surveyor general, in compiling the plat upon the survey made by deputy surveyor Phelps, disregarded the clerical reference as section 37 used by the deputy surveyor in his field notes, and designated the Dimitry grant

by the regulation governmental sectional divisions instead.

This brings us then to a consideration of the Mississippi cases cited by appellants. These cases furnish no support for appellants' contention. *Surget* v. *Little*, 24 Miss. 120, holds that official government plats are the best evidence and cannot be contradicted or assailed collaterally. *Trager* v. *Jenkins*, 75 Miss. 676, concerned a tax sale where land had been paid on under a double assessment. In the Trager case there was a Spanish grant description, by which the land was assessed, that was in all respects definite and sufficient. In our case there is no Spanish grant description; but government survey designates the Dimitry claim by the regulation sectional divisions, and by such description the land had always been described and assessed.

*Dedeaux* v. *Bayou Delisle Lumber Co.*, 112 Miss. 325, 73 So. 53, involved land located in an old Spanish grant which had been surveyed and designated on the government plat as section 38, township 7, and section 7, township 8, all in range 13 west, of St. Stephen's meridian. In the Dedeaux case, the government plats show sections 25 and 36 to be separate and distinct from section 38— but in our case the government plats show the land involved to be in section 33, just where we claim it to be. And the government plats further show section 37 (which appellants assert designates the Dimitry claim) to represent the Philip Saucier claim, some two miles west of the land involved in our suit.

*Goff* v. *Avent*, 84 So. 134, is in favor of appellee's position. For appellants are now trying to do the very thing which this court, in the Goff case and in subsequent cases of like tenor, said cannot be done; namely, to vary or contradict the government township plats.

The case of *Weston Lumber Company* v. *Strahan*, is identical in principle and almost in fact, with the case of *Lott* v. *Rouse.*

The only difference between the Lott case and ours is that in the former the tax purchaser was the one who attempted to contradict the government plat by showing that a description of land having a definite and certain location as shown on the government plat was intended for another and different piece of land which also had a definite and certain location as shown on the government plat. While in our case the tax purchaser (appellee) contends that the land described in his tax deed is located in section 33, as described in his deed, and said section 33 has a definite and certain location on the government plats.

In the foregoing we have answered appellants' argument, we will briefly argue the principles and points of law upon which appellee relies.

Congress provided, by general statute, for the survey not only of public lands but of private claims. 1 Comp. Stat. 348. Obviously, the purpose of a survey was to segregate the private claims from the public lands, where necessary, and further to identify all lands so that their location could be certainly and accurately established. Congress conferred upon the land department a general jurisdiction of these matters.

Government plats are the best evidence and are conclusive of the facts shown thereon, and cannot be attacked collaterally. *Stoneroad* v. *Stoneroad,* 39 L. Ed. 966, at 970; *Russee* v. *Maxwell,* 39 L. Ed. 971; *Knight* v. *United Land Assessment,* 35 L. Ed. 974 at 979; *Whitloke* v. *MacBridge,* 49 L. Ed. 857; *Harris* v. *Smith,* 40 L. Ed. 68; *Haney* v. *Jordan,* 35 L. Ed. 428; *Kumland* v. *Hunter,* 1 L. R. A. (N. S.) 745 at 749; *Surget* v. *Little,* 5 S. & M. 319, 24 Miss. 118; *Weston Lbr. Co.* v. *Strahan,* 90 So. 452.

The legislature may and has provided what shall be a sufficient description for assessing lands and how it shall be established. *Read* v. *Heard,* 53 So. 400. The legislature has provided for the assessment of land ''by

governmental surveys, by descriptions used on govern-ment maps," etc. Section 6917, of Hemingway's Code; *Weston Lbr. Co.* v. *Strahan,* 128 Miss. 54, 90 So. 452.

Section 6917 of Hemingway's Code, in directing the method by which the land roll shall be made up, among other things provides that "lands not surveyed accord-ing to the plan of the government surveys, shall be as-sessed by the designation used on the government maps," etc. The wisdom of this rule is well illustrated by the case at bar.

If credit be given to appellants' contention, not only would there be two sections 37 in the same township and range (an impossible situation on its face), but the fur-ther result would be that lands within the Dimitry claim, embracing some five thousand acres, could then be as-sessed only by innumerable metes and bounds descrip-tions, which would be confusion twice confounded.

In the event of discrepancy between the field notes and the plat, the plat controls. *Surget* v. *Little,* 5 S. & M. 319, 24 Miss. 118; *Weston Lbr. Co.* v. *Strahan,* 90 So. 452. Appellants' ancestor accepted and adopted the government survey when made, hence they are now estopped from complaining. *Carondelet* v. *St. Louis,* 17 L. Ed. 102.

Further, appellee went into the actual occupation of the land immediately upon the delivery of his tax deed in 1913, and has remained in the actual occupation thereof, under his tax deed, ever since.

We respectfully submit that the decree of the lower court is correct, and should be affirmed.

ETHRIDGE, P. J. This is an appeal by Theodore J. Dim-itry and others from a decree of the chancery court dis-missing their bill of complaint by which they sought to recover certain lands from the possession of the appellee J. L. Jones, more particularly described as "that part of the northwest quarter (N. W. ¼) of section thirty-

three (33), township seven (7) south, range twelve (12) west, south of Wolfe river.'' The land in question was acquired by appellee at tax sale in 1911, and in 1920 appellee confirmed his title against the appellants by a proceeding for that purpose in the chancery court. Appellants filed their bill in the present case, in 1925, attacking the validity of the tax sale on the theory that the land involved was a part of an old Spanish grant known as the Dimitry claim or grant; that the Dimitry survey was designated as ''section thirty-seven (37) township seven (7), range twelve (12),'' because so referred to in the field notes of the deputy surveyor who made the survey. They further contended that the United States government was without power to survey said grant according to the customary governmental sectional divisions, and that any assessment by the state of the land according to such sectional divisions was void and could not support a valid tax sale.

Numerous surveys, maps and plats, and voluminous correspondence were introduced on the trial of the cause in the court below. It appears that the land was originally owned by private persons under grant from the Spanish government when the territory involved was ceded to the United States government, and that by special act of Congress these titles were ratified and confirmed in the owners of the property. Nevertheless, the United States government, in surveying the lands, laid off the lands involved in this suit in regular governmental sections, townships, and ranges.

The chancellor upheld the validity of the tax sale, and further found as a question of fact that appellee had been in the actual occupation of the land, under the tax title, for a period of more than three years next preceding the institution of the present suit. From this decree of the chancellor this appeal has been prosecuted here.

The chancellor rendered an opinion, which appears in the record, in the course of which he said that there are

several township plats on file respecting township 7 south, range 12 west; that the first one, and the one which shows the whole township, is one approved February 4, 1847; that this shows the whole township was surveyed out into regular sections, and, among the sections, shows section 33 as a regular section of approximately six hundred forty acres. He also said that there is another plat of part of the township, which plat was approved October 30, 1849, and shows section 33 as a section regular in shape and size, but as being almost entirely within the Dimitry claim; that no section 37 appears on this plat, although it was made up and approved after the plat of the Dimitry survey; that on a supplemental plat, made in the General Land Office in Washington, and approved apparently on March 21, 1906, there does appear a section 37 in township 7 south, range 12 west, but that this section 37 is entirely north of Wolfe river, and does not touch section 33; that it is a part of what was section 31 of said township and range.

The chancellor held, in his opinion, that the state, in making up its land assessment rolls, can use any appropriate description, and that the statute had prescribed a method of assessment which was valid in this case. To quote from the opinion:

"The state, in its duty to government, can adopt any method for making up its land assessment rolls that it deems best only so long as the method adopted conforms to the constitutional requirements of reasonable notice and due process. Section 6917, Hemingway's Code 1917 (section 8213, Hemingway's Code 1927), provides how land assessments shall be made up (1) as to those lands regularly surveyed; and (2) it goes on to provide that 'lands not surveyed according to the plan of the government surveys shall be assessed by the designation used on the government maps, or by other descriptions or names by which they may be distinguished.' If we consider the lands here in question as presenting a reg-

ular survey according to the plan of the government surveys, then the description in the assessment as 'N. W. ¼ Sec. 33,' is undoubtedly good. If, however, the effect of the Phelps survey was to displace the regular plan and convert the lands therein into the class of lands not surveyed according to the plan of the government surveys, then the statute provides that the lands therein 'shall be assessed by the designation used on the government maps.' In every government map introduced in evidence or to which the attention of the court has been called, including the map of the Dimitry survey, touching this township 7 south, range 12 west, there appears on it this section 33 in regular shape, and as already mentioned section 37 is shown on the last map as being some distance to the west and entirely on the other and north side of the river. The 'designation used on the government maps' of section 37 is therefore of an entirely different piece of land from that here in suit, for this land here is wholly on the south side of the river; and if the assessor had assessed this land here in controversy as being in section 37, the complainants could then have successfully insisted that it was not their land thus assessed and sold, but lands entirely on the other side of the river from them. The land here in suit is not 'designated on the government maps' as section 37, but as section 33. It was so assessed, and the description being good for an assessment of it, is good for a tax sale and tax deed of the same, since the latter are required to follow and do strictly follow the assessment on which they are based.''

We think this is a proper construction of the assessment statute. Although the Dimitry and other claims were recognized by the government, and this recognition would prevail over a title granted by the government under a survey made by the government, still the land, when it became private property, was subject to assessment for taxation, and to all the laws regarding that subject. It also became subject to the statutes of limitation

as to adverse possession, and is controlled by those statutes.

This is not a case of conflicting claims between the Spanish government and the United States government; nor of conflicting titles under grants from different governments. The original ownership was unquestionably with the owners of the Spanish grant, and the treaty gave the government no power to sell or dispose of it. Nevertheless the land was surveyed and laid off in regular governmental sections, townships, and ranges, and the state government had the right to assess the property according to these governmental subdivisions. Whether they were wrongfully made, or not, is not material for that purpose. The statute quoted by the chancellor in his opinion directs the assessor to assess lands in the manner in which it was assessed here, and the owner of the land is charged with notice of the statutory method of making the assessment and of the laws bearing on the sale and the possession under claim after sale was made and the time for redemption had expired. It was, therefore, competent for the court to confirm the title, which it did in the suit of 1920.

We are of the opinion that the assessment, sale, and confirmation proceedings were legal and regularly made, and that the title vested through them to the appellee.

As stated by the chancellor, this case is not controlled by the authorities relied upon by the appellant. *Weston Lbr. Co.* v. *Strahan,* 128 Miss. 54, 90 So. 452; *Goff* v. *Avent,* 122 Miss. 86, 84 So. 134; *Id.,* 129 Miss. 782, 93 So. 193; and *Dedeaux* v. *Bayou Delisle Lumber Co.,* 112 Miss. 325, 73 So. 53. Quite different questions would arise had not the tax sale under the statute mentioned and the statutes of limitation come into play. Had it been a contest between claimants under different grants, with no statutes of limitation or tax sales involved, the contention of the appellant might be maintained.

We find no error in the decision of the case, and the judgment of the lower court will be affirmed.

*Affirmed.*

SUGGESTION OF ERROR.

Appellants with respect suggest the following errors in the decision of the court heretofore rendered herein, to-wit:

I.   The court erred in considering that the assessment and tax sale in this case, upon which appellee's title depends, referred to any United States maps, plats or surveys, except the one having a legal existence at the date of sale, for a description of the property levied upon and sold.

II.   The court erred in considering that the issues and facts of this case are different from those decided by this court in the cases of *Weston Lumber Co.* v. *Strahan,* 128 Miss. 54; *Goff* v. *Avent,* 84 So. 134, 93 So. 193; and *Dedeaux* v. *Bayou Delisle Lumber Co.,* 73 So. 53; or *Lott* v. *Rouse,* 111 So. 838.

III.   The court erred in considering in evidence the plat of township 7 south, range 12 west, dated February 4, 1847, as the official map of the United States surveys in said township and range, because said plat was vacated and disregarded by the General Land Office a short time after it was made.

IV.   The court erred in considering that the Phelps' survey, field notes and plat of the Dimitry grant, approved by the surveyor general, south of Tennessee on September 19, 1849, was not the official United States government map of the land within the Dimitry claim and of the section made fractional by said grant.

V.   The construction of the state statute and tax deed, upon which appellee's title depends, was contrary to the provisions of the Act of Congress, dated August 5, 1848, entitled "An Act supplemental to an act to confirm the survey and location of claims for land in the state of Mississippi," etc.   And also, the Act of Con-

gress, dated March 2, 1837 entitled "An Act to confirm the claim of the heirs of Micheal Dragon," etc.

VI. The court erred in disregarding the field notes, approved by the surveyor general's office which appear on the face of the Phelps' map, as describing and identifying the private claim of Dimitry, the same as the lines and figures pictorially represented on said map.

VII. The court erred in considering that the supplemental plat of fractional section 1, township 8 south, range 12 west, dated March 31, 1906, had anything to do with this case.

VIII. The court erred in considering that the supplemental plat of said township and range, dated October 30, 1849, contradicted or varied the Phelps' map and survey of said land, in fact, or had any such legal effect.

IX. The court erred in considering that the government maps in evidence showed section 33 of township 7 south, range 12 west, to be a regular section, and included any land within the private claim of Dimitry.

X. The court erred in disregarding the testimony of the expert civil engineers and surveyors introduced by appellants, who explained and interpreted for the court the meaning of the lines and symbols on the United States government plats and surveys, to the effect that section 33 of said township and range was a fractional section, and included no land within the boundaries of the Dimitry grant. In that, there was no proof to the contrary, and the "common knowledge of courts and juries" should not be permitted to disregard such evidence.

XI. The construction placed upon said statute and tax deed is contrary to the provisions of section 2396, United States Revised Statutes.

XII. Appellants further suggest that the judgment of this court in this case is repugnant to and in conflict with

the laws of the United States, in that the construction placed upon said assessment and tax deed operated to deprive appellants of their property without due process of law, as secured to them by the Fourteenth Amendment to the United States constitution; and, is in conflict with the treaty of the Louisiana cession between the United States and France, ratified October 31, 1803; and, is contrary to the provisions of the Act of Congress of May 18, 1796, and the Amendment thereto, approved March 3, 1803, which provided for the survey and sale of the public lands of the United States; and, is contrary to the rules and regulations promulgated by the General Land Office under the Acts of Congress giving instructions to surveyors and deputy survey and subdivision of the public lands.